IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
WINCHESTER DIVISION

| | | |
|---|---|---|
| **KAREN S. PLESS,** | ) | |
| | ) | |
|     **Plaintiff,** | ) | |
| | ) | Case No. 4:23-CV-00064-CLC-SKL |
| v. | ) | |
| | ) | |
| **HUUUGE GLOBAL, LTD.,** | ) | |
| | ) | |
|     **Defendant.** | ) | |

## FIRST AMENDED COMPLAINT

Plaintiff Karen S. Pless states as follows as to her claims brought in this civil action against defendant Huuuge Global Limited. The purpose of this amended complaint is to replace Defendant Huuuge, Inc. with new Defendant Huuuge Global Limited.

## INTRODUCTION

1. In the last fifteen years, slot machine makers have found a lucrative new way of doing business. In the past, slot machine venues were limited to casinos and other businesses that attract gamblers to come into an establishment and gamble money on slots and other gambling schemes. Now, companies such as defendant Huuuge Global Limited. have leveraged the power of modern smartphones, tablets, and computers to smuggle illegal slot machines into the homes and workplaces of Americans, where gamblers can satisfy their gambling addiction 24 hours a day, 365 days a year, without having to leave their homes or places of work. These new slot machine applications, misleadingly referred to as "social casino games," are nothing more than slot machines that can be carried in one's purse or pocket. Those addicted to slot machines no longer have to travel to a casino. Now they can spend real money gambling from home, work, restaurants,

the grocery store, while on vacation, and anywhere else where the gambler's device can receive signal.

2. It is scarcely a defense that "social casino" slot machines do not afford gamblers the opportunity to win real money because the currency in such games consists of "virtual coins" that are only redeemable as additional opportunities to play the games. This is so for at least two reasons. First, those with gambling addictions have been documented to lose thousands of dollars playing these slot machines, to the point of financial ruin and marital strife, even though these gamblers could never win their money back – only the opportunity for additional spins at the slot machine. Second, the law in many states, including Tennessee, states that the opportunity to win additional playing time is a "thing of value" such that gambling for more playing time is illegal gambling even though the gambler never has the opportunity to win his or her money back. See State v. Vance, 2004 WL 746296 (Tenn. Ct. App., Knox 2004) (holding that additional amusement is a thing of value under Tennessee's gambling statutes); Tenn. Code § 39-17-501(2).

3. The social ills caused by "social casino" games are well-documented. Media reports how gambling addicts spend enormous, and completely unaffordable, amounts of money on these casino games. One nurse in Houston is reported to play a slot machine game similar to defendant's here for a minimum of two hours a day. (Ex. 1, https://www.nbcnews.com/tech/technews/addicted-losing-how-casino-apps-have-drained-people-millions-n1239604 (last accessed on September 7, 2023)). Between her and her husband, who plays the game with her, she estimates they have lost $150,000. She asked NBC News to withhold her name "so her family does not find out how much money they have spent on the game." (Id.). She said her and her husband "lie in bed next to each other, we have two tablets, two phones and

a computer and all these apps spinning Reel Rivals at the same time. We normalize it with each other." (Id.). This is not an isolated instance.

> NBC News spoke to 21 people, including Shellz [the Houston nurse] and her husband, who said they were hooked on the casino-style games and spent significant sums of money. They described feelings of helplessness and wanting to quit but found themselves addicted to the games and tempted by the company's aggressive marketing tactics.
>
> Most of the 21 players wished to remain anonymous, as they were ashamed of their addictions and did not want their loved ones to find out about their behavior.

(Id.). For example, a "42-year-old Pennsylvania woman said she felt saddened that she spent $40,000 [on a social casino app that competes with defendant's] while working as an addiction counselor. 'The whole time I was working as an addiction counselor, I was addicted to gambling and with no hope of winning any money back,' she said."

4. These anecdotal reports of gambling addictions in connection with social casino games like defendant's are buttressed by recent scientific studies that confirm that social casino apps appeal to gambling addicts in much the same way as real Las Vegas-style casinos, and have a particular appeal to teenagers. One of the more troubling statistics comes from studies that show that 30% of social casino gamers between the ages of 12 and 18 later become regular gamblers. Hollingshead, et al., "Motives for playing social casino games and the transition from gaming to gambling (or vice versa): social casino game play as harm reduction?" 46 Journal of Gambling Issues 43 (2021). More broadly, over half of social casino players reported engaging in other forms of gambling on a regular basis. (Id.). Because of this overlap, traditional gambling operators are now heavily invested in defendant's industry as a way to port players from social casino games to real casinos. (Id.). One study showed that an astonishing 58.3 percent of gamblers seeking treatment for gambling addiction "reported social casino games as being their first introduction to

3

gambling activities." Kim, "Social Casino Games: Current Evidence and Future Directions," Gambling Research Exchange Ontario.

5. This case is brought under Tennessee's gambling loss recovery act, a statutory *qui tam* relator cause of action based on the English Statute of Anne of 1710. TN Code § 29-19-104 (2015). This statute authorizes "any other person" to recover a gambler's loses for the use of his or her family:

> Any other person may, after the expiration of the ninety (90) days, and within twelve (12) months thereafter, recover the amount of such money, thing, or its value, by action for the use of the spouse; or, if no spouse, the child or children; and, if no child or children, the next of kin of the loser.

TN Code § 29-19-105 (2015). The Tennessee Supreme Court has repeatedly held that this statute means what it says. See, e.g., Coles v. E.C. & H.E. Morrow, 162 S.W. 577 (Tenn. 1914) (children of person who lost money could bring case even though they were not minors – "There is no such restriction in the statute, and we cannot insert it."); Forrest v. Grant, 79 Tenn. 305 (Tenn. 1883) (holding that even the losing gambler qualified as "any other person" if bringing suit for benefit of spouse).

6. This suit, brought by an individual for the use of those named in the statute, is not a class action pursuant to Rule 23 of the Tennessee Rules of Civil Procedure. The Tennessee legislature has chosen to allow ***any person*** to bring the case, and to allow the benefit to accrue to the family of the losing gamblers, whether or not that person is a proper class representative under Rule 23. It is also not a mass action as defined by the federal Class Action Fairness Act since it is brought by one person. This suit is what is typically called a private attorney general action. Plaintiff does not seek to recover for the family members of any gambler who lost $75,000 or more during the limitations period.

7. The United States Supreme Court has repeatedly recognized that statutory *qui tam* relator causes of action like the one authorized by TN Code § 29-19-105 give "any other person" standing to bring the action. Sprint Communications Co. L.P. v. APCC Services, Inc., 554 U.S. 269 (2008); Vermont Agency of Natural Resources v. United States ex rel. Stevens, 529 U.S. 765 (2000); Marvin v. Trout, 199 U.S. 212, 225 (1905). Indeed, in Marvin v. Trout the Supreme Court was faced with an Ohio gambling loss recovery act based on the Statute of Anne that is similar to Tennessee's but allows the third-party relator to keep the money. O.R.C. § 3763.04. After explaining that the purpose of the statute was to discourage gambling and holding that it did not offend the due process clause of the fourteenth amendment, the court turned to the issue of allowing a third party to recover:

> To say that [such a statute] must be limited to a provision allowing a recovery of the money by the one who lost it, would be in effect to hold invalid all legislation providing for proceedings in the nature of *qui tam* actions. Statutes providing for actions by a common informer, who himself had no interest whatever in the controversy other than that given by statute, have been in existence for hundreds of years in England, and in this country since the foundation of our government. The right to recover the penalty or forfeiture granted by statute is frequently given to the first common informer who brings the action, although he has no interest in the matter whatever except as such informer.

Id. at 225 (citations omitted). The U.S. Supreme Court also noted that this analysis was not affected by whether a particular state gave the party all the money or a "moiety." Id.

8. Various forms of *qui tam* actions continue to exist, including this one. The Supreme Court has determined that relators bringing such cases have standing to sue in federal court under Article III of the United States Constitution. Vermont Agency of Natural Resources v. United States ex rel. Stevens, 529 U.S. 765 (2000). According to Justice Scalia, who wrote for the Court, this conclusion was buttressed by historical considerations:

> We are confirmed in this conclusion by the long tradition of *qui tam* actions in England and the American Colonies. That history is particularly relevant to the

5

Case 4:23-cv-00064-CLC-SKL   Document 16   Filed 01/22/24   Page 5 of 14   PageID #: 74

constitutional standing inquiry since, as we have said elsewhere, Article III's restriction of the judicial power to "Cases" and "Controversies" is properly understood to mean "cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process."

529 U.S. at 774. Justice Scalia then recounted the long history of such actions in England, the American Colonies, and the United States, stretching back to the 13th century going all the way up to modern *qui tam* cases such as those brought under the False Claims Act. The Court then wrote:

> We think this history well-nigh conclusive with respect to the question before us here: whether *qui tam* actions were "cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process."

529 U.S. at 777. The Stevens court concluded that a relator had standing under the False Claims Act pursuant to the assignment of such claims by the government to that individual under the statute. Similarly, Tennessee's loss recovery statute operates as an assignment of rights held by third parties' family members to "any person," including plaintiff.

9. The Supreme Court spoke to the issue again in 2008, this time in the context of "aggregators" who had been assigned multiple small claims to bring on behalf of the assignors, who stood to recover the entirety of the claims minus a fee paid to the aggregator. Sprint Communications Co. L.P. v. APCC Services, Inc., 554 U.S. 269 (2008). The defendant there argued that there was no Article III standing because the aggregators themselves did not suffer any injury based on defendant's conduct. The Court rejected this argument, holding:

> It is true, of course, that the aggregators did not suffer any injury caused by the long-distance providers; the payphone operators did. But the payphone operators assigned their claims to the aggregators lock, stock, and barrel. . . . And within the past decade we have expressly held that an assignee can sue based on his assignor's injuries.

554 U.S. at 286. Having held that the assignors' injury sufficed to confer standing on the assignee aggregators, the Court stated as follows in response to defendant's argument that the aggregators lacked standing because they did not stand to participate in the recovery:

6

> And if the aggregators prevail in this litigation, the long-distance carriers would write a check to the aggregators for the amount [owed]. What does it matter what the aggregators do with the money afterward? The injuries would be redressed whether the aggregators remit the litigation proceeds to the payphone operators, donate them to charity, or use them to build new corporate headquarters. Moreover, the statements our prior cases made about the need to show redress of the *injury* are consistent with what numerous authorities have long held in the assignment context, namely, that an assignee for collection may properly bring suit to redress the injury originally suffered by his assignor.

554 U.S. at 287 (emphasis in original). Here, plaintiff has standing because the law has assigned him the right to recover the gambling losses of other Tennessee residents for the use of those residents' family members.

## PARTIES, JURISDICTION, AND VENUE

10. Plaintiff Karen S. Pless is a citizen of the state of Tennessee, and is an adult resident of Coffee County, Tennessee, which is within the 14th Judicial Circuit.

11. Defendant Huuuge Global Limited is an entity organized under the laws of the nation of Cyprus with its principal place of business in Limassol, Cyprus It does business through its online gambling games throughout the United States, including throughout the state of Tennessee and in Plaintiff's home county. It does not have a physical location in the state of Tennessee.

## FACTUAL AND LEGAL BACKGROUND

12. Defendant Huuuge makes available online games and applications across multiple platforms that are games of chance, and thus illegal gambling, under Tennessee law. Such games violate state law if a patron pays money for the chance to win anything of value. Huuuge's games allow players to win free or extended playing time, which is a thing of value under Tennessee law. See State v. Vance, 2004 WL 746296 (Tenn. Ct. App., Knox 2004) ("The Court explained that the chips that were randomly awarded by the vending machine were 'things of value' under the

gambling statutes because the chips allowed the customer to continue the operation of the machine for amusement.") (citing Painter v. State, 45 S.W.2d 46 (Tenn. 1932). Likewise, the virtual coins in Huuuge's apps allow the customer to continue the operation of the game for amusement.

13. Huuuge makes available online games of chance in a variety of formats including, but not limited to, slot machines, other casino-style games, card games, and other games of chance. Below is a typical example of such games:



14. Customers initially receive some free coins to play the games. They then spend coins to play the game. For example, on the slot type games customers spend some of their coins to spin the reels and win or lose based on the alignment of symbols on the reels just as they would on a physical slot machine. If they lose, they lose the coins wagered. If they win, they win additional coins allowing them to play longer. When a consumer runs out of coins entirely, they must spend real money to purchase coins if they wish to continue playing the game with full functionality. Customers who purchase these coins do so to bet them in the same manner described above.

15. Huuuge or the platform providers like Google, Apple, or Facebook, or all of them, can identify each Tennessee resident who played Huuge's games, as well as the amounts and dates of their gambling losses. This is information easily obtained in discovery, as it could have been in the Stars Interactive case discussed above. 617 S.W. 3d 792, 809 (Ky. 2020) (noting that PokerStars refused to comply with discovery identifying the individual players for five years).

16. Players of defendants' games pay real money to purchase coins, which they then wager in the hopes of winning more coins so that they can continue to play without making additional purchases. They make this wager on the outcome of the spin of a slot machine or the results of other gambling games.

17. Defendants collect millions of dollars in revenue each year from consumers who purchase coins in its apps and use them to play the slot machines and other games of chance.

**THIS CASE IS NOT SUBJECT TO FEDERAL JURISDICTION**

18. This action is not a class action. The legislature authorized "any person" to bring the suit, not just a person who could meet the requirements of Rule 23. The Tennessee Supreme Court has interpreted this broadly, as it is written. See, e.g., Forrest v. Grant, 79 Tenn. 305 (Tenn. 1883).

19. Instead of a class action under Rule 23, this case is what is typically called a "private attorney general action." See Adkinson v. Harpeth Ford-Mercury, Inc., 1991 WL 17177 (Tenn. App. Nash. 1991) (characterizing Tennessee Consumer Protection Act case as private attorney general action brought for public benefit). In such an action, the state or other governmental unit authorizes an individual to act on its behalf and enforce the statute in a private action to enforce a public interest. See, e.g., National Consumers League v. Flowers Bakeries, LLC, 36 F. Supp. 3d 26, 32-33 (D.D.C. 2014). In the Flowers Bakeries case, the plaintiff brought the case, as authorized

by a District of Columbia statute, on behalf of purchasers of particular types of bread, who would recover if it prevailed in the case. Id. at 29. Likewise, Ms. Pless brings this case as a private attorney general for the benefit of the family of Tennesseans who have lost money to Huuuge in illegal gambling, pursuant to Section 29-19-105, which explicitly authorizes this type of suit. Ms. Pless does not seek to recover for the family members of any Tennessean who lost $75,000 or more during the limitations period.

20. The United States Supreme Court has held that actions by an attorney general, no matter how many people may benefit from them, are not "mass actions" or "class actions" under the Class Action Fairness Act, and so cannot be removed to federal court. Mississippi ex rel. Hood v. AU Optronics Corp., 571 U.S. 161, 176 (2014). In Hood, the defendants argued that a case like this one was a mass action under CAFA because, even though there was a single plaintiff, 100 or more persons would benefit from a recovery in the action. Id. at 169. The Supreme Court, in a unanimous decision, rejected this argument, stating that the 100 or more persons mentioned in CAFA "are not unspecified individuals who have no actual participation in the suit, but instead the very 'plaintiffs' referred to later in the sentence—the parties who are proposing to join their claims in a single trial." Id. The Supreme Court stated: "CAFA's '100 or more persons' phrase does not encompass unnamed persons who are real parties in interest to claims brought by named plaintiffs." Id. Likewise, the federal circuit courts of appeals that have considered the issue have unanimously held that an attorney general or private attorney general action not invoking Rule 23 or a state law counterpart is similarly not a class action with the meaning of CAFA. Canela v. Costco Wholesale Corp., 071 F. 3d 845, 851 (9th Cir. 2020); Mississippi ex rel. Hood v. AU Optronics Corp., 701 F.3d 796, 799 (5th Cir. 2012), rev'd on other grounds, 571 U.S. 161. Because a suit by the Attorney General, like a private attorney general action, has only one plaintiff, and is

10

not brought under Rule 23 or any state law equivalent, it is not removable under CAFA. Id. at 176. The same is true in the case at bar.

21. Since Hood was decided in 2014, multiple federal courts have relied upon it to hold that private attorney general suits are likewise not covered by CAFA, and thus not removable unless the claims of the named plaintiff exceed $75,000 dollars in controversy. See, e.g., National Consumers League v. Flowers Bakeries, LLC, 36 F. Supp. 3d 26, 32-33 (D.D.C. 2014); Canela v. Costco Wholesale Corp., 971 F.3d 845, 853 (9th Cir. 2020). This case should likewise be heard in state court. The federal courts thus lack jurisdiction because the amount-in-controversy requirement for the named plaintiff cannot be met. For avoidance of doubt, plaintiff does not seek to recover for anyone who lost $75,000 or more during the statute of limitations period.

22. In recent case brought against this very defendant under Alabama's substantively identical gambling loss recovery statute, which likewise authorizes individuals to seek recovery of gambling losses for the use of family members, Judge Liles C. Burke recently ruled that the case should be remanded to state court for lack of subject matter jurisdiction. Gann v. Huuuge, Inc., 2023 WL 5202376 at *1 (N.D. Ala. Aug. 14, 2023). More specifically, Judge Burke held that the amount-in-controversy requirement of 28 U.S.C. § 1332 could not be met because the amounts sought for each family member could not be aggregated to meet the requirement. Id. at *3-4.

23. The federal courts do not have jurisdiction over this civil action because the plaintiff does not allege that she seeks to recover for any person an amount of $75,000 or more, exclusive of interest and costs. Therefore, diversity jurisdiction does not exist because of the lack of the requisite amount in controversy.

11

Case 4:23-cv-00064-CLC-SKL   Document 16   Filed 01/22/24   Page 11 of 14
PageID #: 80

## CLAIM FOR RELIEF

24. Pursuant to Tennessee Code Section 29-19-105, plaintiff seeks recovery of all sums paid by Tennessee residents to Huuuge in its online gambling games during the period beginning one year before the filing of this complaint until this case is resolved, except that she does not seek recovery of any money lost by a Tennessee resident who lost $75,000 or more during the statute of limitations period.

25. As required by Section 29-19-105, Plaintiff seeks this recovery for the benefit of each individual gambler's spouse, or if no spouse, child or children, and if no child or children, the next of kin.

## PRAYER FOR RELIEF

Plaintiff respectfully prays that this court:

1. Remand this case to state court, where the 14th judicial district of Tennessee can do the following:

2. Following discovery, enter a final judgment against Huuuge awarding to the family or next of kin of all gamblers that made payments from Tennessee all money paid to play the illegal gambling games described herein, except for amounts paid by gamblers who lost $75,000 or more during the statute of limitations period;

3. Appoint a special master to determine all proper recipients of the money at issue; and

4. Award interest, costs, and any other relief to which plaintiff is entitled.

Respectfully submitted this 22nd day of January, 2024,

/s/ Dargan M. Ware
Dargan M. Ware (pro hac vice)
Attorney for Plaintiffs

**COUNSEL:**

Garth R. Segroves
113 West Moore Street
Tullahoma, Tennessee 37388
Telephone: 931.393.4366
Facsimile: 931/259/4466
garth_segroves@att.net

Jeffrey L. Bowling
BEDFORD, ROGERS & BOWLING, P.C.
303 North Jackson Street
P.O. Box 669
Russellville, AL 35653-0669
Telephone: 256.332.2880
jeffbrbpc@bellsouth.net

John E. Norris
Dargan M. Ware
DAVIS & NORRIS, LLP
Telephone: 205.930.9900
Facsimile: 205.930.9989
jnorris@davisnorris.com
fdavis@davisnorris.com
wbarnett@davisnorris.com
dware@davisnorris.com

13

Case 4:23-cv-00064-CLC-SKL   Document 16   Filed 01/22/24   Page 13 of 14
PageID #: 82

## CERTIFICATE OF SERVICE

  The undersigned hereby certifies that a true and correct copy of the foregoing was served on all counsel of record through the CM/ECF electronic filing system of the United States District Court for the Eastern District of Tennessee on January 22, 2024.

            /s/ Dargan M. Ware
            Dargan M. Ware
            One of the Attorneys for Plaintiff

14

Case 4:23-cv-00064-CLC-SKL   Document 16   Filed 01/22/24   Page 14 of 14
PageID #: 83